**Khanh TRAN, Plaintiff–Appellee,**

v.

**Juanita HILBURN, Defendant–Appellant,**

**and**

**Le Van Than, Defendant.**

**No. 95CA1662.**

Colorado Court of Appeals,
Div. I.

April 17, 1997.

Rehearing Denied May 22, 1997.

Certiorari Granted Dec. 2, 1997.

Law Office of David J. Greene, David J. Greene, Denver, for Plaintiff–Appellee.

Rodman & Ross–Shannon, John R. Rodman, Denver, for Defendant–Appellant.

Schaden, Lampert & Lampert, P.C., Brian Lampert, Denver, for amicus curiae Colorado Trial Lawyers Association.

Opinion by Judge ROY.

Defendant, Juanita Hilburn, appeals a judgment entered on a jury verdict awarding plaintiff, Khanh Tran, damages for economic and noneconomic losses suffered as a result of a rear-end collision. We reverse and remand for a new trial.

Plaintiff initiated this combined action as a result of his being involved in two motor vehicle accidents. The first accident occurred on December 18, 1989, when the plaintiff was a passenger in an automobile driven by his brother-in-law, defendant Le Van Than. The second accident, with which we are concerned, occurred on February 5, 1990. In that accident, plaintiff was a passenger in the backseat of a utility vehicle when it was rear-ended by defendant Hilburn. Plaintiff alleged that, as the result of the combined accidents, he suffered a traumatic brain injury, post-traumatic stress disorder, and a spinal ligament tear.

The issues at trial were liability and apportionment of the injuries and damages between the accidents and, thereby, the defendants.

At trial, plaintiff offered the testimony of several experts to prove the nature, effects, extent, and cause of his injuries. Among other things, plaintiff sought to prove he was permanently disabled because of his injuries and could never return to substantial gainful activity.

In its verdict, the jury attributed 20% of plaintiff's injuries to defendant Hilburn, 75% to defendant Le Van Than, and 5% to designated non-parties involved in a third and later accident. Hilburn's portion of the total damages was $121,688, and only she has appealed.

## I.

Hilburn contends the trial court erred in admitting the results of two scientific tests, a Quantitative Electroencephalogram (QEEG) and Videofluoroscopy (VF), on the basis that neither had been generally accepted in the applicable scientific community. We agree with respect to the admission of QEEG, disagree with respect to VF, and conclude that reversal and retrial are required.

■ With regard to the admission of novel scientific evidence, our supreme court continues to adhere to the test set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), which requires the trial court to evaluate whether: 1) the underlying theory or princi-

ple is generally accepted in the relevant scientific community and 2) the techniques used to apply the theory or principle are generally accepted in the relevant scientific community. Accordingly, although amicus curiae argues otherwise, such is the test we must apply here. *See Lindsey v. People*, 892 P.2d 281 (Colo.1995) (acknowledging, but declining to follow, the U.S. Supreme Court's rejection of *Frye* and adoption, on non-constitutional grounds, of a more lenient standard under Fed.R.Evid. 702 in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

 The level of acceptance in the scientific community should be assessed at the time the evidence is offered at trial. *Lindsey v. People, supra.* Usually, a trial court has considerable discretion in ruling upon the admissibility of evidence, and we will find an abuse of discretion only if the ruling is manifestly arbitrary, unreasonable, or unfair. *People v. Ibarra*, 849 P.2d 33 (Colo.1993). However, whether general acceptance existed with regard to novel scientific evidence at the time of trial is a question of law we review *de novo*. *See Lindsey v. People, supra.*

 In evaluating the general acceptance of novel scientific evidence under the *Frye* test, a court must first identify the scientific theory, the techniques used, and the relevant scientific community at issue. Then, as described by the supreme court in *Lindsey v. People, supra*, a trial court should consider: 1) the evidence presented at trial; 2) scientific literature on the state of the science in question; and 3) rulings from other jurisdictions employing the same admissibility questions.

## A.

 QEEG was offered here as an objective test for mild closed-head injury. Symptoms of mild closed-head injury include: (1) physical symptoms such as nausea, headaches, dizziness, fatigue, lethargy, and sensory loss; (2) cognitive deficits such as loss of attention, concentration, perception, and memory not otherwise explainable; and (3) behavioral changes such as increased irritability, quickness to anger, disinhibition, and mood swings not otherwise explainable.

Mild closed-head injury is generally diagnosed subjectively, that is, based on the statements of the patient. However, here, the plaintiff is difficult to diagnose subjectively because his first language is Vietnamese; his facility in the English language is severely limited; and, because he came to the United States as a refugee, there is an absence of historical medical or education records, or standardized test results.

There is a conflict in the expert testimony as to whether plaintiff suffers from a closed-head injury. In addition, it is evident that plaintiff's expert, whose diagnosis was subjective, relied in part on QEEG to bolster his diagnosis even though he was not permitted to so testify.

QEEG, in its simplest terms, is a computer enhanced electroencephalogram that compares the brain activity of the patient with a database of the brain activity of normally functioning brains. The trial court admitted this evidence over Hilburn's objection based on the testimony of plaintiff's expert, a neuropsychiatrist, and a report issued in 1994 by a task force of the American Medical EEG Association (AMEEGA).

At the outset, we note that, contrary to plaintiff's assertion, Hilburn did make a specific objection at trial to the admission of the QEEG test following voir dire of plaintiff's expert witness. Therefore, she properly preserved this issue on appeal. *See Hancock v. State*, 758 P.2d 1372 (Colo.1988) (pursuant to CRE 103(a)(1), a timely specific objection at trial is required to preserve evidentiary questions for appellate review).

Plaintiff's expert witness explained that the theory behind QEEG is that it can identify microscopic problems resulting from a closed-head injury that cannot be detected on traditional CT scans or MRIs.

As to the technique employed, the test is administered by placing a cap on the patient's head with electrodes to detect brain activity. The patient goes through a series of directed activities, *e.g.*, sitting with eyes open, sitting with eyes closed, performing math problems, and reading. The instru-

ment measures the electrical brain activity during the directed activities. Thereafter, the electroencephalographic recordings are entered into a computer that digitizes them and compares them to a database of normal same-aged persons and by that means identifies anomalies in the patterns of brain activity in braindamaged patients.

QEEG can also, according to its proponents, perform a "discriminate analysis," in which a report is generated indicating the probability that the patient's brain activity pattern matches a pattern identified with a particular type of injury.

In support of QEEG's general acceptance, plaintiff offered the expert testimony of a neuropsychiatrist who had studied the diagnostic capabilities of QEEG, published an article on the uses of QEEG, and had lectured nationally on the subject. The witness had also performed a QEEG evaluation of plaintiff and expressed his opinion, based in part on QEEG, that plaintiff suffered from a mild closed-head injury.

The expert testified that QEEG became a generally accepted technique in 1994, following a study performed by a task force of the AMEEGA. The task force published findings concluding that:

> Although continuing to develop, QEEG technology has matured sufficiently and is now well established. Concerns regarding its clinical use have primarily resulted from its misapplication and misinterpretation stemming, largely from inadequate personnel training and expertise.

F. Duffy, J. Hughes, F. Miranda, P. Bernad, & P. Cook, *Status of Quantitative EEG (QEEG) in Clinical Practice*, 25 Clinical Encephalography VI (1994). The AMEEGA task force estimated there are 300 QEEG units used in clinical practice in North America.

Hilburn cites a number of scientific journals that cast doubt on QEEG and offered the expert testimony of two psychiatrists who expressed the opinion that QEEG was not a reputable and reliable procedure; had not been proven or accepted by the medical community; and had not been recognized by the American Board of Psychiatry & Neurol-

ogy, the American Psychiatric Association, or the American Neurological Association.

QEEG is apparently used quite extensively as a research instrument but is not widely used by clinicians as a diagnostic tool. Undisputed evidence presented by Hilburn reveals that QEEG is not considered reliable in the professional organizations which count in their membership the majority of the clinicians who would use the instrument for diagnostic purposes.

Plaintiff argues that the disapproval by dissenting professional organizations predated the report of AMEEGA in 1994. While that is true, it is not enlightening. The positions taken by the dissenting organizations are relatively recent, and there is little indication that they, or the clinicians they represent, have changed their view.

AMEEGA is a relatively small, highly specialized professional organization consisting of both clinicians and research scientists with special interests in encephalography. In addition, we do not read the AMEEGA report as indicating general acceptance for clinical and diagnostic uses, much less general acceptance in the relevant scientific community. In any event, the position of professional organizations, while helpful, is by no means determinative.

In our view, for the purposes of this case, the relevant scientific community is the community of clinicians who diagnose and, based on that diagnosis, treat brain injured patients. General acceptance in that community implies that the instrument is relied upon by a significant number of clinicians as providing valid and valued assistance in diagnosing and subsequently treating brain injured patients. There is no indication in this record that QEEG has reached a general level of acceptance in that community.

Two appellate courts have held that a trial court did not abuse its discretion in excluding QEEG, or similar technology, on the basis of the scientific literature. *Ross v. Schrantz*, 1995 WL 254409 (Minn.App.) (not selected for official publication) (QEEG); *State v. Zimmerman*, 166 Ariz. 325, 802 P.2d 1024 (Ariz.App.1990) (Brain Electrical Activity Mapping (BEAM)).

We conclude that QEEG is not generally accepted in the relevant scientific and clinical community for the purposes for which the evidence was offered. Therefore, the trial court erred in admitting the evidence.

■ Plaintiff further argues that, even if the QEEG evidence should not have been admitted, any error is harmless. We disagree.

■ Error predicated on the admission of evidence is harmless unless it affects the substantial rights of a party. *Hancock v. State, supra.* But the error is not harmless if a different result might have been reached had the evidence been excluded. *Clark v. Buhring,* 761 P.2d 266 (Colo.App.1988).

An objective diagnostic test of an injury otherwise only subjectively diagnosed deserves, and here probably was given, considerable weight. In addition, one of Hilburn's assertions was that plaintiff was a malingerer, the manifestations of which parallel many of the subjective symptoms of mild closed-head injury. Therefore, we cannot conclude with any confidence that a different result would not have obtained if the QEEG evidence had been excluded. Accordingly, admission of this evidence was prejudicial error requiring reversal of the judgment against Hilburn.

### B.

■ For guidance on retrial, we also address Hilburn's contention that the trial court erred in admitting the results of a Videofluoroscopy (VF) performed on plaintiff, indicating a torn alar ligament. We perceive no error.

Again, admissibility of the VF results is to be determined by application of the *Frye* test discussed above.

VF is essentially a videotaped x-ray motion picture showing the patient's bone and soft tissue structures in motion. According to plaintiff's expert, VF is capable of detecting a ligament tear or other spinal abnormality that would not be identified by normal x-ray or by other diagnostic means. The relevant scientific community for use of VF is apparently limited to chiropractic professionals.

The trial court denied Hilburn's pre-trial motion to exclude the testimony of plaintiff's expert witness with respect to VF after concluding that VF met the *Frye* requirements.

The evidence offered at the pretrial hearing included a statement issued by the International Chiropractors Association (ICA) recognizing VF as an "acceptable analytical tool"; a statement by the American Chiropractic College of Radiology (ACCR) that it "no longer considers Spinal Videofluoroscopy as investigational within the chiropractic profession"; a letter from a neurosurgeon who had examined plaintiff; and the VF performed on plaintiff by his expert. The trial court noted plaintiff's expert would be available for cross-examination with respect to his use of VF as a diagnostic tool.

At trial, plaintiff's chiropractic expert witness testified as to the acceptance of VF and that he routinely uses it as a diagnostic tool. During the testimony the expert explained to the jury the location and purpose of the alar ligament and demonstrated, with the aid of a model, how the head and neck move when the alar ligament is intact. Then, the expert presented the VF he had made of plaintiff and pointed out how plaintiff's movements were abnormal and why the abnormality indicated a torn alar ligament.

Plaintiff also offered the testimony of a chiropractic orthopedist, who said VF had been in use since 1910, that he knew of no better technique for diagnosing a torn ligament, and that the plaintiff's expert was the only chiropractor in Denver using the instrument. This second witness also stated that he had examined and treated plaintiff, had reviewed plaintiff's VF, and concurred with the first expert's interpretation of the VF.

Hilburn called a dentist who testified that he does not use VF to treat temporomandibular joint problems and that VF has not been accepted as a diagnostic test by the American Academy of Cranial Disorders or the American Dental Association. An orthopedic surgeon opined that VF was inadequate for detecting a torn alar ligament. A chiropractor testified that he did not use VF in his practice and that in his opinion the reliability of the test had not yet been verified.

The evidence presented, while conflicting, leads us to conclude that VF is generally accepted within the field of chiropractic. We also conclude that the chiropractic profession can serve as the relevant scientific community for purposes of the *Frye* test and any dispute between it and the medical profession regarding VF goes to weight, not admissibility. *See Destin v. Sears, Roebuck & Co.*, 803 S.W.2d 113 (Mo.App.1990).

Therefore, as the record supports the trial court's admission of VF under the *Frye* test, we conclude that it was not error to admit the VF technology through a doctor of chiropractic for chiropractic diagnosis purposes, and under a similar state of the record, such evidence may be admitted on retrial.

## II.

Among other issues that may arise on retrial is Hilburn's contention that the trial court abused its discretion when it prevented her from introducing evidence of plaintiff's legal history to impeach plaintiff's expert psychiatric witness. We perceive no abuse of discretion.

It is within the trial court's discretion to determine the scope and limits of cross-examination. *People v. Rodriguez*, 914 P.2d 230 (Colo.1996). Additionally, a trial court has considerable discretion in ruling upon the admissibility of evidence, and we will find an abuse of discretion only if its ruling is manifestly arbitrary, unreasonable, or unfair. *People v. Ibarra, supra.*

Plaintiff's expert witness, a psychiatrist who had treated the plaintiff over a period of time, offered the opinion that plaintiff suffered permanent cognitive deficits and lingering depression as a result of the closed-head injury he received in the auto accidents. The doctor concluded plaintiff's condition made it difficult for him to obtain job training, maintain a job, and reintegrate himself into society. He also offered his opinion that plaintiff was not a malingerer.

Hilburn attempted to introduce evidence of a deferred judgment entered against plaintiff in 1988 to show the doctor had not elicited a thorough history from plaintiff and thereby cast doubt on his diagnosis and his opinion that plaintiff was not a malingerer. The court barred the evidence based on its prejudicial effect.

Evidence is relevant if it tends to make a fact at issue in the case more or less probable. CRE 401. Pursuant to CRE 403, relevant evidence may be excluded if its probative value is outweighed by its prejudicial effect.

Hilburn has not defined what relationship may exist between the plaintiff having a prior deferred judgment and his being, or not being, a malingerer. The failure of the psychiatrist to be aware of the deferred judgment may go to his care and thoroughness, but there is no indication that the knowledge would affect the opinion. Therefore, the impeachment value of the deferred judgment would have been slight in comparison to its potential prejudicial effect.

Hilburn relies on *People v. Alward*, 654 P.2d 327 (Colo.App.1982), in which the prosecution challenged a psychiatrist's opinion by introducing evidence of prior conduct by the defendant of which the psychiatrist was unaware at the time he formed his opinion. A division of this court explained that an expert witness may be cross-examined as to the basis of his opinion; therefore, it was not error to admit the evidence. However, the court did not say that the evidence must be admitted on cross-examination, or that it would be fundamentally unfair to exclude it.

Here, the record reflects that Hilburn engaged in a thorough cross-examination of plaintiff's psychiatric witness as to the basis of his opinion. Excluding evidence of the deferred judgment did not preclude an effective cross-examination. As the prejudicial effect on the plaintiff would have been great, we find the trial court did not abuse its discretion by excluding it and denying Hilburn's motion for a new trial on this basis. Hence, on retrial, admission of the challenged evidence would again be a discretionary ruling for the trial court to make.

## III.

In support of the defense theory that the accident was staged, Hilburn offered evidence that other passengers had also sued

her. However, the trial court barred the evidence, and Hilburn asserts that ruling was error. We disagree.

A trial court has broad discretion in deciding upon the admissibility of evidence, and unless its ruling is manifestly arbitrary, unreasonable, or unfair, we will not disturb it on review. *People v. Ibarra, supra.* A court may exclude relevant evidence if it is cumulative or is likely to confuse or mislead the jury. CRE 403.

Here, the trial court ruled Hilburn could not introduce evidence that four other occupants of the vehicle in which plaintiff was a passenger at the time of the accident also brought claims against Hilburn. In the court's view, the evidence was irrelevant, cumulative, and misleading. The court did, however, permit cross-examination of the other occupants on that issue if they testified; one did.

In addition, Hilburn was not in any way prevented from offering the testimony of a Denver police detective to support her theory that the accident was staged and the claims were fraudulent. The detective had been assigned to the Asian community since 1984, had known plaintiff since 1986, and had attended yearly seminars on accident investigation, which included discussions of staged accidents. The detective offered his opinion that the accident had been staged, and explained what led him to that conclusion.

In light of the detective's testimony, general exclusion of evidence of other legal claims against Hilburn was not so unfair to her as to require a new trial. The jury had before it two theories of the case. The evidence Hilburn sought to introduce would not necessarily have made her theory any more plausible. The trial court was not unreasonable in ruling that the evidence was cumulative and misleading. Therefore, we find the trial court did not abuse its discretion in excluding the evidence or in denying Hilburn's motion for a new trial on this basis. Hence, again, on retrial admission or exclusion of the evidence will be a matter within the trial court's discretion.

Because we have reversed and remanded for a new trial, we need not address issues related to the trial court's denial of defendant's motion for new trial.

The judgment against Hilburn is reversed, and the cause is remanded for a new trial consistent with this opinion.

METZGER and ERICKSON *, JJ., concur.