Sherri L. SCHULTZ, Plaintiff–Appellee,

v.

Nancy M. WELLS, Defendant–Appellant.

No. 99CA0688.

Colorado Court of Appeals,
Div. III.

Aug. 17, 2000.

Rehearing Denied Oct. 12, 2000.

Susan Morath Horner, Boulder, Colorado, for Plaintiff–Appellee.

Quigley, Hibschweiler, Johnson & Ritter, LLC, James D. Johnson, Robert F. Hibschweiler, David F. Jasper, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge DAVIDSON.

This personal injury action resulted from an accident in which a vehicle in which plaintiff, Sherri L. Schultz, was a passenger was struck from behind by a car driven by defendant, Nancy M. Wells. The trial court granted plaintiff's pre-trial motion for summary judgment on the issue of liability, and after trial on the issue of damages, the jury awarded plaintiff $221,000. Defendant appeals from the judgment entered on that verdict, and we affirm.

## I.

■ Defendant first argues that the trial court erred in granting partial summary judgment against her on the issue of liability. We disagree.

Summary judgment is proper when the pleadings, affidavits, depositions, or admissions show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. The burden of establishing the nonexistence of a genuine issue of material fact is on the moving party. C.R.C.P. 56(c); *Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708 (Colo.1987).

The movant may satisfy this burden by showing there is no record evidence supporting the nonmoving party's case. Once the movant has met the initial burden of production, the burden shifts to the nonmoving party to establish that there is a triable issue of fact. *Civil Service Commission v. Pinder,* 812 P.2d 645 (Colo.1991).

Here, in her supporting affidavit to her summary judgment motion on liability, plaintiff asserted that while her vehicle was slowing to stop for a red light, the defendant's vehicle "suddenly hit us from the rear" and that no other cars were involved in the accident. Additionally, in her reply, plaintiff supported her motion with her interrogatory response, regarding the circumstances of the collision, which was consistent with her affidavit.

The trial court found that plaintiff's evidence was sufficient to establish facts supporting the application of the presumption of negligence. *See Bettner v. Boring,* 764 P.2d 829 (Colo.1988) (the driver causing a rear-end collision is presumed to have been negligent). Although defendant had pled the sudden emergency doctrine as a defense, the trial court found that defendant failed to submit any evidence of a material fact relating to her negligence. As a result, the court granted summary judgment, in favor of plaintiff, on the issue of liability.

In challenging the court's ruling defendant asserts that it was undisputed that the accident occurred in icy conditions and that she had pled the defense of sudden emergency as described in *Young v. Clark,* 814 P.2d 364 (Colo.1991). As a result, she argues that a genuine issue of fact was created as to whether the icy roads created a sudden emergency.

However, a review of the record indicates that defendant neither alleged nor provided any factual support, in her pleadings or otherwise, for the allegation that she could not avoid hitting plaintiff's car because of a sudden emergency caused by ice on the roads, or any other cause. *See* C.R.C.P. 56(e) ("an adverse party may not rest upon the mere allegations or denials of the opposing party's pleadings, but the opposing party's response by affidavit or otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial.").

Therefore, we perceive no error in the trial court's ruling. *See Sullivan v. Davis,* 172 Colo. 490, 474 P.2d 218 (1970) (a genuine issue cannot be raised by counsel simply by means of argument).

## II.

Defendant's central contention is that the trial court erred in excluding certain expert testimony related to the impact of the collision. Defendant claims that the trial court used the wrong test to assess admissibility

and then erred in concluding that particular evidence was inadmissible. We disagree.

### A.

At trial, defendant's witness was received as an expert in the fields of engineering, accident reconstruction, and biomechanics. The expert testified that the accident resulted in the plaintiff's vehicle experiencing a change in velocity of between four and four and one-half miles per hour. This would have subjected the plaintiff's lower back to a maximum of five horizontal G-forces, i.e., five times the force of gravity, her mid and upper back would have experienced eight horizontal G-forces, and her head would have experienced approximately 12–12.5 horizontal G-forces. The expert also testified that testing on primates has demonstrated that a threshold of between 100 and 200 G-forces is required to produce a closed head injury.

However, the trial court prohibited the expert from testifying about the threshold speed/force injury results of rear-end crash testing with human volunteers. After hearing evidence as to the reliability of the test results, the trial court excluded this testimony. The court ruled that evidence indicating there is a threshold force level below which a person probably could not be injured in a rear-end automobile collision is inadmissible under both the test articulated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), and the Colorado Rules of Evidence.

### B.

■ As a threshold matter, defendant contends that it was error for the trial court to use the *Frye* test to determine the admissibility of the disputed evidence. For two reasons, we disagree. First, we disagree that the *Frye* test is no longer viable in Colorado. Secondly, to the extent that the trial court relied on *Frye*, it did not do so exclusively.

The two-pronged test for admissibility of expert scientific evidence derived from *Frye v. United States, supra*, requires that there must be (1) a general acceptance in the relevant scientific community of the underlying theory or principle and (2) a general accep-tance in the relevant scientific community of the techniques used to apply that theory or principle. *See Fishback v. People*, 851 P.2d 884 (Colo.1993).

In Colorado, the *Frye* test has been used only if proffered scientific evidence is based on "novel scientific devices and processes involving the evaluation of physical evidence." *See People v. Perryman*, 859 P.2d 263 (Colo.App.1993). *See also Brooks v. People*, 975 P.2d 1105 (Colo.1999) (distinguishing between hard science with "complex scientific trappings" and social science or experienced-based opinions).

To date, the supreme court has assessed scientific evidence under *Frye* in three cases; two involving DNA typing evidence and one regarding polygraph examinations. *See Fishback v. People, supra; Lindsey v. People*, 892 P.2d 281 (Colo.1995); and *People v. Anderson*, 637 P.2d 354 (Colo.1981). Divisions of this court have utilized *Frye* for tests of hair samples for heavy cocaine use, *People v. Thomas*, 962 P.2d 263 (Colo.App.1997); for tests used to assess closed head injury, *Tran v. Hilburn*, 948 P.2d 52 (Colo.App.1997); for blood grouping tests, *People v. Saathoff*, 837 P.2d 239 (Colo.App.1992), and *E.M.F. v. N.N*, 717 P.2d 961 (Colo.App.1985); and for a semen analysis test for determining blood type, *People v. Banks*, 804 P.2d 203 (Colo.App. 1990). *See also Smith v. Belle Bonfils Memorial Blood Center*, 976 P.2d 344 (Colo.App. 1998) (applying the *Frye* test to testimony regarding the advisability of testing of a blood supply for the AIDS virus).

On the other hand, Colorado courts have refused to apply *Frye*, and instead have analyzed admissibility under the less restrictive test of CRE 702, in those circumstances such as experience-based knowledge of canine scent tracking, *Brooks v. People, supra*; testimony regarding the reliability of eye-witness identifications, *People v. Campbell*, 785 P.2d 153 (Colo.App.1989), *rev'd on other grounds*, 814 P.2d 1 (Colo.1991); and rape trauma syndrome testimony, *People v. Hampton, supra* (applying CRE 702 when the expert testimony was not used to establish that a crime had been committed). *See also Colwell v. Mentzer Investments, Inc.*, 973 P.2d 631 (Colo.App.1998) (applying the

rules of evidence to expert testimony regarding the effect of stress on multiple sclerosis); *People v. Fears,* 962 P.2d 272 (Colo.App. 1997) (shoe print examination and identification); *People v. Perryman, supra* (same).

From this we conclude that, although the federal courts have done so, *see Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Colorado has not yet abandoned *Frye* as an exclusive test of admissibility of certain expert testimony. However, its application remains very narrow. *See Brooks v. People, supra* (*Frye* analysis is appropriate as an exclusive requirement of admissibility but only in assessing "novel" scientific evidence and only in the realm of "hard science.").

### C.

Defendant next argues, that, even if *Frye* remains a viable test, it was inapplicable here. We agree that reliance on the *Frye* analysis as the exclusive test of admissibility here would have been inappropriate.

The applicability of the *Frye* test is a question of law which requires *de novo* review. *Lindsey v. People, supra.*

In assessing whether proffered evidence involves novel scientific processes or devices, the inquiry is whether the evidence depends on "any scientific device or process" or involves "the manipulation of physical evidence." *Colwell v. Mentzer Investments Inc., supra,* 973 P.2d at 636. *See People v. Hampton, supra* (novel scientific devices and processes include lie detectors, experimental systems of blood typing, voiceprints, identification of human bite marks, and microscopic analysis of gunshot residue).

Here, however, the excluded evidence related to the results of automobile collision experiments with human volunteers; specifically, the resulting threshold of force below which a person probably could not be injured in a rear-end automobile collision. These tests did not involve a novel scientific process or device applied to the "manipulation" of physical evidence. Moreover, the jury's ability to understand the techniques and procedures used to conduct the tests was not dependent upon a familiarity with highly technical or obscure scientific theories.

Accordingly, we agree with defendant that the Colorado Rules of Evidence, rather than the general acceptance test required under *Frye,* provided the appropriate framework to determine the admissibility of the evidence at issue here. However, the trial court clearly did not rely exclusively on *Frye,* but also analyzed the issue in depth under CRE 402 and 702. Thus, we conclude that the court's consideration of the *Frye* test here was not inappropriate.

### D.

A proper application of the rules of evidence, defendant argues, required the admission of the excluded evidence. Again, we disagree.

### 1.

In general, all relevant evidence is admissible. CRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." CRE 401. Relevant evidence may not be admissible, however, if "its probative value is substantially outweighed by the danger of unfair prejudice." CRE 403.

CRE 702, which governs the admission of expert evidence, provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In determining reliability and validity of the underlying substance of the expert's opinion, CRE 702 requires a two-tiered analysis. The trial court must balance "(1) the reliability of the scientific principles upon which the testimony rests, i.e., the potential to aid the jury in reaching an accurate resolution of a disputed issue, and (2) the likelihood that the introduction of the evidence may overwhelm or mislead the jury." *Colwell v. Mentzer Investments, Inc., supra,* 973 P.2d at 636. *See also Brooks v. People,*

*supra* (the court must determine whether, on this subject, a jury can receive appreciable help from this expert).

In assessing helpfulness to the jury under CRE 702, courts have employed numerous factors to assess the reliability of the scientific evidence. For example, in *Colwell v. Mentzer Investments, Inc., supra,* 973 P.2d at 636, a division of this court instructed trial courts to consider "factors such as the degree of acceptance in the scientific community, the novelty of the scientific principle, and the existence of specialized literature on the subject." The level of expertise of the expert, and the understandability of the subject, were relevant factors in *People v. Fears, supra.* In *People v. Anderson, supra,* the supreme court applied the *Frye* test of general acceptance, but also looked at the external variables present in polygraph testing, such as the testing atmosphere and the qualifications of the examiners, that impair the diagnostic reliability of the results.

■ Thus, we conclude that, in order to analyze an expert's testimony based on scientific evidence for its potential to aid the jury under CRE 702—by assessing the validity of the scientific principles, as well as the likelihood that the evidence may overwhelm or mislead the jury—a trial court may use a wide variety of reliability factors depending on the nature and subject of the testimony.

In its determination that the admissibility of testing based on scientific, technical, or other specialized knowledge should be evaluated under the Federal Rules of Evidence and not *Frye,* the United States Supreme Court outlined several "general considerations" to help guide the lower federal courts when making such determinations, including: (1) the testability of the scientific theory or technique; (2) whether the theory or technique had been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence or nonexistence of maintained standards; and (5) whether the theory or technique has general acceptance in a relevant scientific community. *See Daubert v. Merrell Dow Pharmaceuticals, Inc., supra; see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■ However, although we disagree with defendant's suggestion that these "*Daubert* factors" supply an exclusive test available to be "adopted" or not by a state court, to the extent the general considerations may be useful to evaluate the reliability of non-novel scientific expert evidence, trial courts in Colorado also may use such factors, if applicable to the evidence, under CRE 702. *Cf. Brooks v. People, supra* (*Daubert* has been neither explicitly endorsed nor rejected in Colorado). We note that the fourth factor set forth in *Daubert*—general acceptance within the relevant scientific community—reaffirms, at least as one of several factors to be examined, the *Frye* test.

**2.**

**a.**

■ Applying these principles here, we address, and reject, defendant's contention that the trial court abused its discretion by refusing to admit testimony on the injury potential of low-speed accidents.

Analyzing the proffered evidence under CRE 702, the trial court first found that the expert was qualified to testify as an expert engineer. However, with regard to the content of the test results, the court found that such evidence would not be helpful to the jury in that the test results "are inadequate for the purpose for which they are being offered." In other words, the court ruled that the force threshold for probability of injury demonstrated in the test results could not be used to "prove that a particular person was not injured or was likely not injured in this accident."

In coming to this conclusion, the court reasoned that tests used to ascertain safety for the purposes of doing a cost-benefit analysis with regard to the expense of designing the seat of a car were not applicable to prove that a particular person was unlikely to be injured in a specific accident. The court assessed the usefulness of presenting a probability theory to the jury, and concluded that such testimony would be confusing and misleading to the jury.

The court also found that "there is no agreement, far from it; in the engineering field or in the automobile industry concerning whether there is such a threshold [of injury]." And, under a *Frye* analysis, the court added that there was "clearly no general acceptance in the engineering field" of either the underlying theory or the techniques of the study to establish that the theory is valid.

Additionally, the court questioned the validity of using a series of tests designed for one purpose (designing cars) for a different purpose (assessing a threshold of applied force for injury in rear-end car accident). Specifically, the court addressed the circumstances of the tests that did not correspond with the circumstances of a rear-end car accident. It noted the fact that the statistical sample in the tests was "extremely low," and there were "no controls among and between the experiments with regard to age, physical conditions [and] actual position of the body." Also, the court noted the "expectation factor" of knowing one is going to be hit, as opposed to being unaware of an impending collision. The court concluded that there "is great controversy in the field about the quality and comparability of these tests."

We conclude that the trial court properly analyzed the expert scientific evidence at issue here for its potential to aid the jury and used appropriate factors to review the validity of the scientific principles and the likelihood that the evidence may mislead the jury. The record supports the trial court's conclusions.

As a result, we conclude that the trial court did not abuse its discretion in excluding the expert evidence regarding the force threshold injury test results of rear-end crash testing on humans.

b.

■ We also disagree with defendant's contention that the trial court abused its discretion by refusing to admit evidence of horizontal G-forces which occur during daily human activities, such as coughing, stepping off a curb, skipping rope, lifting, etc.

At trial, defendant argued that daily living activities evidence would have been useful to the jury to get a sense of the practical significance of the horizontal G-forces sustained during the collision. The trial court, however, disagreed, and found that the list of representational horizontal G-forces did not take into consideration the entire mechanical movement of a body during a car collision, in that it did not address forces from other directions and the position of the body at the time of the accident.

The court specifically addressed the applicability of the G-forces sustained while being hit in a bumper car. The court indicated that such an activity is "somewhat similar" to a rear-end car accident, but noted that bumper cars is a game in which "a great deal of bracing action occurs."

Thus, the court concluded, evidence of "horizontal G-force[s] in daily living [situations] would be very misleading because it is not in the context of an entire activity of the body when that activity was occurring." As such, it excluded the evidence.

As discussed, the trial court had discretion under CRE 403 to exclude relevant evidence that would confuse the issues or mislead the jury. *Colwell v. Mentzer Investments, Inc., supra,* and its determination to exclude the evidence had a reasonable basis. Because of the lack of similarity between horizontal G-forces sustained during daily living activities and the numerous forces sustained during an unexpected rear-end automobile collision, evidence of the former would have been misleading. *Cf. Kling v. City & County of Denver,* 138 Colo. 567, 335 P.2d 876 (1959) (to admit the results of an experiment, it is not necessary that the conditions be identical, it is "sufficient if there is a substantial similarity").

III.

■ Finally, we disagree with defendant that the trial court erred in admitting plaintiff's expert's testimony as to the economic damages sustained by plaintiff.

## A.

According to defendant, the expert's testimony was inadmissible because he incorrectly assumed that plaintiff had a college degree.

At trial, plaintiff's expert testified that, as a vocational rehabilitation expert, it was his opinion that plaintiff's permanent injuries would prevent her from continuing her career as an independent real estate agent. As a result, the expert estimated her lifetime earning losses and, for at least some of his calculations, used census earning figures for college-educated women.

The expert testified that because plaintiff was short of meeting graduation requirements by only one class, which she intended to complete, and because she had been working a job equivalent to that of a college graduate, it was more appropriate, in his opinion, to assess her loss as if she had a college degree.

In response to defendant's challenge to the expert testimony, the court observed that experts might disagree about whether it is appropriate to assess plaintiff's losses as if she had a college degree. However, the court ruled that to the extent the expert's opinion could be undermined because plaintiff did not have a college degree, such information went to the weight of the expert's testimony, not its admissibility.

■ CRE 703 allows an expert to rely upon data that is of "a type reasonably relied on by experts in the field," and is not at variance with the actual evidentiary facts of the case. *Walford v. Blinder, Robinson & Co.*, 793 P.2d 620 (Colo.App.1990).

Here, the expert testified that his reliance on census figures for college-educated women was, in his opinion, appropriate under the circumstances of this case. Therefore, the record does not support defendant's claim that the expert's opinion was "buttressed by assumed facts at variance with the actual facts." *See In re High*, 638 P.2d 818, 820 (Colo.App.1981).

Additionally, the jurors were made aware of the expert's judgment call and were, therefore, given the opportunity to accord it the weight they felt was appropriate. *See People v. Hampton*, 746 P.2d 947 (Colo.1987) (flaws present in expert testimony go to weight to be given evidence rather than its admissibility).

## B.

■ Defendant also contends that the expert's testimony was inadmissible because he did not testify that his opinions were within "a reasonable degree of probability." We perceive no basis for reversal.

The trial court held that the expert's opinion was a pure methodological analysis of plaintiff's loss based on his research and his experience, and the use of factors which he believed to be true. Hence, the court concluded that such an opinion did not lend itself to a probability analysis. Under these circumstances, we agree.

■ Moreover, once a witness is qualified as an expert, the fact that examination reveals that the witness cannot support his or her opinion with certainty goes only to the weight to be given to the opinion and not to its admissibility. *Klein v. State Farm Mutual Automobile Insurance Co.*, 948 P.2d 43 (Colo.App.1997). *See also David v. Schwarzwald, Robiner, Wolf & Rock*, 79 Ohio App.3d 786, 607 N.E.2d 1173 (1992) (attorney's expert opinion in legal malpractice case did not involve questions of probability); *Roth v. Law*, 579 S.W.2d 949, 958 (Tex.App.1979) (allowing an economist to "guesstimate" as to reduced earning capacity because damages for loss of future earning capacity is always uncertain, "and they must be proved with the degree of certainty of which they are susceptible.")

Further, counsel has not cited any case requiring an economic expert to testify that his or her opinion is within a requisite degree of certainty or probability.

The judgment of the trial court is affirmed.

Judge NEY and Judge ROY concur.