21CA1914 Peo v Landrock 03-27-25

COLORADO COURT OF APPEALS

Court of Appeals No. 21CA1914
City and County of Denver District Court No. 19CR6076
Honorable Edward D. Bronfin, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Sean Landrock,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE GROVE
Harris and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 27, 2025

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, James S. Hardy, Lead Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1 Defendant, Sean Landrock, appeals his judgment of conviction entered upon a jury verdict finding him guilty of second degree murder and three counts of misdemeanor child abuse – knowing/reckless, no injury. We affirm.

## I. Background

¶ 2 The jury could have reasonably found the following facts from the evidence introduced at trial.

¶ 3 Landrock and the victim lived together with the victim's three sons, aged five, four, and one. Their relationship was difficult due in part to the victim's depression and unhealthy coping mechanisms, which included suicidal ideation and self-harm.

¶ 4 On the day of the victim's death, her five-year-old son was found screaming outside of their apartment that his mom was dead. When officers arrived, the child told them Landrock had shot his mother. They found the victim dead on her apartment floor with her one-year-old son alive near her. She had been killed by a single shot to the chest, but she also had a stab wound in her upper right chest; a shallow, six-inch cut on her neck; cuts on her forearm; bruises on one of her arms and under her right eye; and several lateral scars on her forearm and thighs. A shotgun lay four feet

1

from her left foot and six feet from her left hand, and her bloody handprints and footprints were spread around the apartment's living room.

¶ 5 The prosecution charged Landrock with first degree murder, three counts of child abuse, and one count of tampering with physical evidence.

¶ 6 At trial, Landrock claimed the victim committed suicide. He presented evidence that he had left her on the day of the shooting because he could not take her self-destructive behavior anymore and asserted that she shot herself because of his departure. In support of this theory, a defense expert opined that suicide could not be ruled out because the shotgun's muzzle had been in contact with the victim's body when it fired.

¶ 7 In contrast, the prosecution, in support of its theory that Landrock was the shooter, presented forensic evidence suggesting that the shotgun was several feet away from the victim when it fired and that it had been wiped down afterward, along with testimony from the victim's son and individuals with whom he interacted shortly after the shooting. The prosecution also offered testimony describing the couple's turbulent relationship, including a

neighbor's description of an altercation that she overheard the night before the victim's death.

¶ 8 A jury found Landrock guilty of second degree murder and three counts of misdemeanor child abuse. On appeal, Landrock contends that the district court reversibly erred when it (1) admitted certain expert testimony from the prosecution while excluding other expert testimony from the defense; (2) failed to suppress statements made by Landrock to police after he had invoked his Fifth Amendment rights; (3) improperly admitted other acts evidence and hearsay evidence; and (4) failed to instruct the jury that manslaughter — aiding suicide is a lesser included offense of first degree murder. He also contends that the cumulative effect of these alleged errors deprived him of a fair trial.

## II.     Expert Testimony

¶ 9 Landrock contends the court reversibly erred by denying his request for an evidentiary hearing on the admissibility of testimony from two prosecution experts while also placing limitations on a similar defense expert. We are not persuaded.

## A. Standard of Review and Applicable Law

¶ 10    We review a district court's ruling on the admissibility of expert testimony and its decision whether to hold an evidentiary hearing for an abuse of discretion. *Kutzly v. People*, 2019 CO 55, ¶ 8; *People v. Rector*, 248 P.3d 1196, 1201 (Colo. 2011). A trial court abuses its discretion only when its ruling is manifestly arbitrary, unreasonable, or unfair. *King v. People*, 785 P.2d 596, 603 (Colo. 1990).

¶ 11    The standard for evaluating the admissibility of expert testimony in Colorado is outlined in *People v. Shreck*, 22 P.3d 68 (Colo. 2001). Under *Shreck*, a court may hold an evidentiary hearing to make specific findings under CRE 403 and CRE 702 about the reliability of the scientific principles involved, the expert's qualifications to testify to such matters, the usefulness of the evidence to the jury, and its potential prejudice. But a court is not required to hold a hearing provided it has before it sufficient information to make those findings. *People v. Whitman*, 205 P.3d 371, 383 (Colo. App. 2007); *People v. McAfee*, 104 P.3d 226, 229 (Colo. App. 2004). This discretion comports with the court's need to "avoid unnecessary 'reliability' proceedings in ordinary cases where

the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Ruibal v. People*, 2018 CO 93, ¶ 13.

¶ 12    The focus of a Rule 702 inquiry is whether the scientific evidence proffered is both reliable and relevant.  In determining whether the evidence is reliable, a trial court should consider (1) whether the scientific principles on which the witness's opinions are based are reasonably reliable and (2) whether the witness is qualified to opine on such matters.  *Shreck*, 22 P.3d at 77.

### B.    Prosecution Experts

#### 1.    Additional Facts

¶ 13    Before trial, the prosecution endorsed as expert witnesses two forensic scientists who worked in the field of firearm and toolmark identification at the Denver Police Department Crime Laboratory.

¶ 14    The first expert, Nathan Von Rentzell, examined the shotgun for functionality and to assess the possibility of an accidental discharge.  Among other things, he performed a "shock test" in

5

which he struck the gun with a mallet from multiple directions to see if it would fire without the trigger being pulled.

¶ 15    The prosecution's other firearms expert, Zachary Kotas, conducted testing intended to show how far the muzzle of the shotgun was from the victim when it was fired.

¶ 16    In a pretrial motion, Landrock asserted that Von Rentzell's and Kotas's conclusions were "subjective, based on faulty scientific principles, and [were] not repeatable and testable" and that the court should thus hold a *Shreck* hearing before allowing either witness to testify.  The prosecution maintained that a hearing was unnecessary, arguing that Von Rentzell's methodology produced reliable results — at least for the limited purpose of determining whether the shotgun was prone to accidental discharges — and pointed out that Kotas's testing followed a well-defined methodology that has been in use in one form or another since 1858.

¶ 17    The district court denied Landrock's motion for a *Shreck* hearing, ruling that Von Rentzell's "shock test" did not present a "unique or novel evidentiary issue" and that Kotas's anticipated testimony was of the type that is regularly admitted in similar

contexts under CRE 702.[1]  Because the defense had not presented

any new studies or data calling into question the scientific validity

of the methods used by the prosecution's experts — which were

outlined in the its response to Landrock's motion — the court found

that there was no reason to hold a *Shreck* hearing.

## 2.    Analysis

¶ 18    A court is not limited to specific factors when considering the

reliability of expert testimony but may make a flexible inquiry

tailored to the facts before it.  *Shreck*, 22 P.3d at 78 (citing *Kumho*

*Tire*, 526 U.S. at 150).  "If a party fails to state a specific challenge

pursuant to *Shreck*, a trial court may determine that the request

does not warrant a *Shreck* analysis."  *Rector*, 248 P.3d at 1201.

Moreover, "[d]epending upon the extent to which the reliability of

the . . . principles at issue has already been determined or is not

---

[1] We acknowledge that the district court did not directly address the substance of Kotas's anticipated testimony and appeared to focus instead on the general admissibility of ballistics evidence and defense counsel's failure to present any new studies or other information casting doubt on the reliability of the methodology.  The court's lack of specificity does not hamper our analysis, however, because its main point — that the defense had not presented any nonspeculative reason to question the reliability of the widely recognized testing methodology that Kotas used — still stands.

disputed at all, . . . further evidence of their reliability may not be required." *People v. Shannon*, 2024 COA 41, ¶ 29 (citation omitted).

¶ 19　　Landrock's opening brief offers little support for his argument regarding the reliability of Von Rentzell's shock test, as it merely asserts that the court failed to "make specific findings about the reliability of either prosecution expert's proposed testimony." We question whether this argument is adequately developed, *see People v. Leverton*, 2017 COA 34, ¶ 65, but even if it is, we conclude that the court's findings were adequate. As the court observed, it was debatable whether expert analysis would even be required to determine "whether the shotgun in this case would misfire," but regardless, the defense did little more than speculate that Von Rentzell's approach was an unreliable method for resolving that question. Accordingly, because the defense did not provide any substantive reason to question the reliability of Von Rentzell's testing, the district court did not abuse its discretion when it determined that the general concerns raised did not warrant a *Shreck* hearing because those concerns went to the weight of Von

Rentzell's testimony and not its admissibility.[2] *See Shreck*, 22 P.3d at 78 (Concerns about an expert's certainty can be resolved "by [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," not by excluding the expert's testimony.) (citation omitted); *Est. of Ford v. Eicher*, 250 P.3d 262, 269 (Colo. 2011) (testing error rates and the reliability of testing methods are proper topics for cross-examination); *Schultz v. Wells*, 13 P.3d 846, 853 (Colo. App. 2000) (explaining that the fact that an expert cannot be certain about an opinion only affects its weight, not its admissibility).

¶ 20     Kotas's testing methods were deemed reliable on similar grounds. As the prosecution pointed out in its response to Landrock's *Shreck* motion, Kotas applied "the modified Griess test," which tests "for the presence of nitrate powder" and has been used

---

[2] Even if the district court erred by declining to hold an evidentiary hearing on Von Rentzell's proposed testimony, we fail to see how that decision could have prejudiced Landrock. No one claimed that the shotgun went off accidentally. To the contrary, the prosecution asserted that Landrock intentionally or knowingly shot the victim, and Landrock maintained that the victim pulled the trigger herself. Under these circumstances, Von Rentzell's opinion about the likelihood of an accidental discharge could not have affected Landrock's substantial rights, and thus, any error was harmless. *See Yusem v. People*, 210 P.3d 458, 469 (Colo. 2009).

in one form or another for more than 150 years.  There is nothing

novel about using chemical testing to estimate the range at which a

firearm was discharged.  *See, e.g., State v. Brown*, 115 Ohio St. 3d

55, 2007-Ohio-4837, 873 N.E.2d 858, at ¶ 25 (2007) ("Based on a

chemical test known as the Griess test, Jones found 'numerous

nitrates' around the entrance site and determined that the muzzle-

to-target distance was one to two feet."); *see also* Susan L. Thomas,

Annotation, *Admissibility, in Homicide Prosecution, of Evidence as to*

*Tests Made to Ascertain Distance from Gun to Victim when Gun Was*

*Fired*, 11 A.L.R.5th 497 (1993).  Thus, in the absence of any new

evidence that the protocol Kotas followed was faulty, *see People v.*

*Genrich*, 2019 COA 132M, ¶ 31, the court appropriately exercised

its discretion in concluding that an evidentiary hearing was not

required, *see Shreck*, 22 P.3d at 76-78 (mentioning the court may

consider the existence of specialized literature dealing with a

technique and whether such evidence has been offered in previous

cases to support or dispute the method at issue).

¶ 21     We are not persuaded otherwise by *Jorgenson v. People*, 482

P.2d 962, 964 (Colo. 1971), in which our supreme court excluded

the results of a distance determination test because "the conditions

10

[under which the testing was performed] were not substantially similar" to the conditions in which the shooting occurred.[3] The testing in *Jorgenson* was unreliable because the expert used different ammunition than the "cartridges [that] were in the gun the night of the killing," and the cloth employed in test had a "different composition" than the victim's clothing. *Id.* In addition, the shirt that the victim wore was not tested for gunshot residue until six months after the shooting, and the expert "could not testify as to whether this time difference would affect the fact that he found no nitrites on the shirt." *Id.*

¶ 22    Kotas's testing protocols were not similarly flawed. As he explained at trial, he conducted his testing using the alleged murder weapon, the same type of ammunition, and swatches of the victim's clothing. He used the samples to compare the gunpowder residue and particle patterns left on the swatches to the pattern on

---

[3] The People argue that *Jorgenson v. People*, 482 P.2d 962 (Colo. 1971), "no longer provides the standard for admitting distance-determination evidence" because it was decided before the Colorado Rules of Evidence were adopted. We need not address this contention because we conclude that *Jorgenson* is distinguishable from the facts before us in this case.

the victim's clothing.[4]  Thus, because Kotas accounted for and avoided the methodological shortcomings that resulted in the exclusion of the distance determination in *Jorgenson,* the district court did not err in determining that a *Shreck* hearing was not required.

## C.    Defense Expert

¶ 23    Landrock challenges several rulings relating to his defense expert, contending that the district court erred by (1) denying defense counsel pretrial access to the shotgun to take measurements and make a mold of its muzzle and (2) denying his in-trial request to make a clay mold of the shotgun's muzzle for use as a demonstrative exhibit.

### 1.    Additional Facts

¶ 24    Three weeks before trial, Landrock submitted a motion requesting that the court provide defense counsel with fifteen

---

[4] Kotas conceded at trial that he did not know how the shotgun was angled relative to the victim when it fired but said that detail would not affect the deposit of gunshot residue.  In other words, according to Kotas, the angle at which the shotgun was fired was not relevant to his distance determination.  *See Jorgenson,* 482 P.2d at 964 (noting that the expert "did not fire the test shot at angles to determine whether this was relevant").

minutes of unsupervised, private access to the shotgun in order to, as the district court described it, "photograph and measure the shotgun, as well as to apply a foreign substance to a portion of the shotgun which they assert (without further explanation) is critical to their defense strategy." Landrock offered to take any precautions the court or prosecution felt necessary to preserve the integrity of the weapon, which at the time was under the control of the Denver Police Department.

¶ 25 The court mostly denied the motion, ruling it did not have the authority to order "ex parte examinations and handling of evidence" in police custody.[5] It therefore declined to order unsupervised access to the shotgun but nevertheless directed the prosecution to make it available for photographs and measurements under its ordinary protocols. The court later modified its order to allow the defense team to photograph a person of similar height to the victim while she was pointing the shotgun at her own chest to support its

---

[5] The Colorado Supreme Court recently reaffirmed that, because there is no common law right of discovery in criminal cases, "district courts have 'no freestanding authority to grant criminal discovery beyond what is authorized by the Constitution, the rules, or by statute.'" *In re People v. Silva-Jaquez*, 2025 CO 11, ¶ 19 (citation omitted).

case that the victim could have committed suicide. It flatly denied, however, the defense's request to "apply a foreign substance to a portion of the shotgun" because the request "fail[ed] to establish the relevancy or reasonableness requirement" of Crim. P. 16(I)(d)(1).

¶ 26    During trial, the defense asked the court to allow its expert, Michael Arnall, a forensic pathologist, to make a clay mold of the shotgun muzzle in front of the jury as a demonstrative exhibit. The intent was to demonstrate that the shape of the gun's muzzle matched the shape of the victim's gunshot wound. The prosecution objected to this request, arguing that the defense's expert disclosures had not suggested that Arnall intended to "perform[] testing or [use] clays or anything on any type of item" during his testimony. The court denied the request for two reasons. First, it found the defense had failed to make "any presentation . . . of the reliability or reproducibility of . . . clay molds of the muzzle of a shotgun [or] showing that that is a generally, scientifically accepted [methodology], especially when this [witness] is [a physician], not a firearms expert." Second, the court found that in the absence of any showing that a clay mold would "reliably and accurately reflect[] the shape" of the shotgun muzzle, there was "potential for

14

significant prejudice with little relevance when we have the firearm itself." Thus, since Arnall's claim — that the gun's muzzle matched the shape of the victim's wound — could be illustrated using already admitted photographic evidence and the shotgun itself, the incremental probative value of the proposed demonstration was miniscule.

### 2. Applicable Law

¶ 27    CRE 702 and 403 govern the admission of expert testimony. While CRE 702 focuses on the reliability and relevance of the proposed testimony, CRE 403 provides that evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

### 3. Analysis

¶ 28    Landrock's argument that the court erred when it denied his request for unsupervised access to the shotgun is insufficiently developed to allow for appellate review. His opening brief includes a single sentence asserting that the court had "no legal or practical underpinning" for its ruling. This statement not only overlooks the

15

district court's detailed written order but also includes no substantive argument. We therefore decline to address his contention. *See People v. Rios*, 2020 COA 2, ¶ 7 n.1 ("[W]e will not consider a bald legal proposition presented without argument or development.").

¶ 29 We discern no error in the district court's denial of Landrock's mid-trial request to create a clay mold of the shotgun's tip for use as a demonstrative exhibit. The district court found that Landrock presented no evidence demonstrating the reliability and repeatability of the proposed, undisclosed technique; questioned whether Arnall's background as a physician would qualify him to conduct the test; and concluded, in any event, that Arnall would be able to convey virtually identical information to the jurors by showing them the shotgun itself and the photographs of the victim's wound. We agree with the district court that these findings formed a proper basis for denying Landrock's request.

### III. Motion to Suppress

¶ 30 Landrock contends the court erred when denying his motion to suppress portions of his video interrogation. We disagree.

16

A. Additional Facts

¶ 31    On the night of the shooting, Landrock was taken to the police department for questioning. His interrogation was videotaped and is included in the appellate record.

¶ 32    At the start of the interrogation, the detective advised Landrock of his *Miranda* rights and ensured he knew that he was speaking to her voluntarily and could stop the interview at any time. The two then began discussing the nature of Landrock's relationship with the victim and her children, as well as his activities before the shooting.

¶ 33    Landrock moved to suppress portions of his interrogation, arguing that he had invoked his Fifth Amendment rights when he said, "I'm damn near done talking about this shit, man. There ain't nothing more to fucking say," and, about five minutes later, "This line of questioning is over." The detective continued her questioning after each of these statements but ceased when Landrock later said, "I need a fucking lawyer to convince somebody that I didn't do this shit."

¶ 34    The court denied Landrock's motion, finding that the first two statements did not unambiguously invoke his right to silence. *See*

*People v. Arroya*, 988 P.2d 1124, 1129-30 (Colo. 1999). It reasoned that "I'm damn near done talking" was a "qualification saying, I'm just about done with this." It found the rest of his sentence, "There ain't nothing more to fucking say," was partly related to his grief about the victim's death and his personal experience with the foster care system, both of which had been discussed just before. The court also noted that Landrock reengaged with the detective after the first exchange. After about five minutes, Landrock stated, "This line of questioning is over," which the court found only related to the topics that had just been discussed, as opposed to an objectively unequivocal wish to stop talking altogether. It therefore denied his motion to suppress.

B.     Standard of Review and Applicable Law

¶ 35     Whether the district court erred by failing to suppress evidence presents a mixed question of fact and law. *People v. Kutlak*, 2016 CO 1, ¶ 13. Ordinarily, we defer to the district court's factual findings that are supported by the record but review the district court's legal conclusions de novo. *Id.* But when, as here, "the statements sought to be suppressed are audio- and video-recorded, and there are no disputed facts outside the recording

controlling the issue of suppression, we are in a similar position as the trial court to determine whether the statements should be suppressed." *Id.* (quoting *People v. Madrid*, 179 P.3d 1010, 1014 (Colo. 2008)). Thus, we may undertake an independent review of the audio or video recording to determine whether the statements were properly suppressed in light of the controlling law.

¶ 36 Before undergoing a custodial interrogation, a suspect must be advised of his *Miranda* rights, which include the Fifth Amendment right to remain silent in the face of questioning, as well as the right to counsel. *Arroya*, 988 P.2d at 1130. A suspect may cut off questioning at any time by invoking either right. *Id.*

¶ 37 To invoke his right to silence, "a suspect must clearly articulate the desire to remain silent so that a reasonable police officer in the circumstances would understand the suspect's words and conduct to mean that the suspect is asserting [his] *Miranda* right to cut off questioning." *Id.* at 1129-30. Still, the suspect need not use special or ritualistic phrases, or "speak with the discrimination of an Oxford don." *Id.* at 1132 (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)). Because suspects might have "only limited skills for verbalizing their wishes in a custodial

setting, a court must give 'a broad, rather than a narrow, interpretation' to requests to cut off questioning." *Id.* (citation omitted).

¶ 38    After a suspect invokes the right to remain silent, the police must scrupulously honor the assertion of that right. *Id.* at 1134; *see Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975).

### C.    Analysis

¶ 39    After reviewing the videotaped interrogation, we conclude that the disputed statements were not an unambiguous invocation of Landrock's right to remain silent. Landrock's assertion that he was "*near* done" was not the same as saying that he *was* done. (Emphasis added.) And that is particularly true when his statement is considered together with his next sentence — "There ain't nothing more to fucking say," which could be reasonably interpreted as an expression of grief rather than a request to cease the interrogation — and his prompt reengagement with the interviewing officer. Likewise, Landrock's reference to "this *line* of questioning" could reasonably be interpreted as a request to move on from a particular topic that he did not want to discuss further. (Emphasis added.)

¶ 40     Accordingly based on our review of the videotaped interrogation, we agree with the district court that Landrock's statements were "expressions of annoyance, anger, frustration and outrage that he was being charged or suspected" rather than a clear and unambiguous invocation of his right to remain silent.

## IV.   Evidentiary Issues

¶ 41     Landrock contends the court erred when it admitted other act evidence under CRE 404(b) and related statements under CRE 807. He also asserts the court erroneously admitted evidence under the now-defunct res gestae doctrine.  We perceive no error.

### A.     Standard of Review and Applicable Law

¶ 42     Courts have considerable discretion in determining the admissibility of evidence, including application of the residual hearsay exception, *People v. McFee*, 2016 COA 97, ¶ 16, and prior acts evidence, *Bondsteel v. People*, 2019 CO 26, ¶ 45.  A court abuses its discretion only if its decision is "arbitrary, unreasonable, or unfair." *People v. James*, 117 P.3d 91, 94 (Colo. App. 2004).

### B.     The Victim's Black Eye

¶ 43     We first address the district court's admission of evidence that Landrock gave the victim a black eye a few days before the shooting.

## 1. Additional Facts

¶ 44    The victim visited family in South Dakota nine days before her death.  According to trial testimony from the victim's mother, the victim had a black eye during this visit and told them Landrock had accidentally elbowed her.[6]  Later, however, in an emotional confession, the victim told her sister that the black eye was not caused by an accident.  While she was on her way back to Denver, she messaged her sister, "[Re]member, don't say anything to anyone or I'll be in danger."

¶ 45    The prosecution argued that evidence of the victim's black eye was admissible under CRE 404(b) to show Landrock's intent and motive, and it asserted that the victim's statements (on which the mother's and sister's accounts were partially based) were admissible under CRE 807, the residual hearsay exception.

¶ 46    The court agreed and admitted the evidence.

## 2. Hearsay

¶ 47    Hearsay is an out-of-court statement admitted for the truth of the matter asserted.  *People v. Thompson*, 2017 COA 56, ¶ 101.

---

[6] The prosecution's motion to admit the victim's statements alleged that the victim said that the black eye was the result of a fall.

Hearsay statements are generally inadmissible unless they fall within an exception. *Id.*

¶ 48 Under the residual exception to the hearsay rule, the proponent must establish by a preponderance of the evidence that the statement is supported by "circumstantial guarantees of trustworthiness." CRE 807; *see Vasquez v. People*, 173 P.3d 1099, 1106 (Colo. 2007). In considering the trustworthiness of a statement, courts should examine the nature and character of the statement, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which the statement was made. *People v. Jensen*, 55 P.3d 135, 139 (Colo. App. 2001) (citing *People v. Fuller*, 788 P.2d 741, 744 (Colo. 1990) (analyzing admissibility under CRE 804(b)(5), CRE 807's predecessor).

¶ 49 The exception for residual hearsay allows a hearsay statement to be admitted if it has "circumstantial guarantees of trustworthiness" and satisfies CRE 807's three-part test: The statement is offered as evidence of a material fact; the statement is more probative on the point for which it is offered than any other

available evidence; and admission of the statement will serve the purpose of the rules and the interests of justice. CRE 807.

¶ 50 In evaluating a statement's trustworthiness, the district court examines the nature and character of the statement, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which the statement was made. *McFee*, ¶ 19.

¶ 51 We discern no abuse of discretion in the district court's application of CRE 807's three-part test. First, the victim's statements were relevant to establish Landrock's potential motive. *See McFee*, ¶ 23 ("In a homicide trial, evidence of prior threats, mistreatment, or malice by the defendant toward the victim is admissible to show the defendant's motive and culpable mental state." (quoting *Jensen*, 55 P.3d at 140)). Second, because the victim was deceased and there was no evidence that anyone else was aware of the cause of her black eye, her statements were more probative on the point for which they were offered than any other evidence which the prosecution could procure through reasonable efforts. Third, admission of the statements served the rules and interests of justice because, as the district court found, they were

relevant to Landrock's motive and culpable mental state. And finally, the statements possessed circumstantial guarantees of trustworthiness. As in *McFee*, ¶¶ 18-26, the statements were made to a close family member, under circumstances that were not self-serving, and in a manner that appeared to be sincere. Therefore, any contradictions in the testimony, including a statement by the victim's son that there was no violence in the home, were questions properly left to the jury.

### 3. CRE 404(b)

¶ 52 "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." CRE 404(b)(1). It may, however, "be admissible for another purpose" including "proving motive, opportunity, intent, preparation, plan, knowledge, [or] identity." CRE 404(b)(2).

¶ 53 To be admissible under CRE 404(b), evidence of other acts must (1) relate to a material fact of consequence in determining the action; (2) be logically relevant; (3) have logical relevance independent of the prohibited intermediate inference that the defendant was acting in conformity with his bad character; and

25

(4) have probative value that is not substantially outweighed by the danger of unfair prejudice. *Bondsteel*, ¶ 50 (citing *People v. Spoto*, 795 P.2d 1314 (Colo. 1990)).

¶ 54 The district court found that the evidence related to the victim's black eye shed light on the "nature of the relationship [between her and Landrock] in the August 2019 time frame." Regarding *Spoto*'s third prong, the court explained that the recent act of violence, and the similar circumstances surrounding both incidents, was logically relevant independent of the prohibited propensity inference because both incidents were close in time and "involve[d] the same victim" and "acts of violence toward the victim."

¶ 55 Landrock maintains that the only relevance of the testimony about the black eye rested on propensity — specifically, that Landrock's past abuse of the victim made it more likely that he shot her. But the victim's claim that Landrock had recently perpetrated domestic violence against her went to motive, particularly for the purpose of proving Landrock's motive to kill the victim. *See* 1 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 4:19, Westlaw (database updated Dec. 2024) (Uncharged acts of domestic violence may be admitted "on a noncharacter motive theory; the

26

uncharged acts evidence hostility toward the victim, and in turn that hostility may be the motive for the charged act of domestic violence."). As the prosecution pointed out in its motion requesting to admit the statements, evidence of a recent incident of domestic violence perpetrated by Landrock made it more likely that he had malice toward the victim and thus acted after deliberation and with the intent to kill her. *See People v. Curtis*, 657 P.2d 990, 992 (Colo. App. 1982) ("[T]he prior attack by the defendant on the victim is admissible as evidence of intent in that it is probative of malice and ill toward the victim."), *aff'd*, 681 P.2d 504 (Colo. 1984). This theory — that Landrock intentionally killed the victim because he had malice toward her — was bolstered by the victim's statement to her sister that she feared what would happen if her sister revealed that the black eye was the result of an assault, rather than an accident.

¶ 56    Nor do we perceive a substantial risk of unfair prejudice arising from the admission of the victim's statements, a conclusion that finds support in the fact that the jury acquitted Landrock of the first degree murder charge. While the evidence may have been damaging to Landrock's defense, it did not inject considerations

extraneous to the merits of the case because it evidenced Landrock's attitude toward the victim. *See People v. Gibbens*, 905 P.2d 604, 608 (Colo. 1995) ("[U]ndue prejudice can result from the tendency of proffered evidence 'to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, such as the jury's bias, sympathy, anger or shock.'") (citation omitted). Accordingly, the district court did not abuse its discretion by declining to exclude the evidence under CRE 403.

#### 4.    The Neighbor's Testimony

¶ 57    At trial, a neighbor of Landrock and the victim testified that the night before the shooting, she heard a man and a woman arguing on their balcony, and the woman said, "Get away from me." The court admitted this testimony as res gestae evidence. On appeal, Landrock points out that the res gestae doctrine has been abolished in Colorado and argues that the neighbor's testimony was not admissible under CRE 404(b) or any other evidentiary theory. We disagree.

#### a.    Standard of Review and Applicable Law

¶ 58    In *Rojas v. People*, 2022 CO 8, our supreme court abolished the res gestae doctrine. In its place, the supreme court adopted an

intrinsic-extrinsic framework to determine whether the admission of uncharged misconduct evidence must be analyzed under Rule 404(b).

> Intrinsic acts are those (1) that directly prove the charged offense or (2) that occurred contemporaneously with the charged offense and facilitated the commission of it. Evidence of acts that are intrinsic to the charged offense are exempt from Rule 404(b) because they are not "other" crimes, wrongs, or acts. Accordingly, courts should evaluate the admissibility of intrinsic evidence under [CRE] 401-403. If extrinsic evidence suggests bad character (and thus a propensity to commit the charged offense), it is admissible only as provided by Rule 404(b) and after a *Spoto* analysis. Conversely, if extrinsic evidence does not suggest bad character, Rule 404(b) does not apply and admissibility is governed by Rules 401-403.

*Id.* at ¶ 52.

### b. Analysis

¶ 59    Landrock asserts that the neighbor's testimony was inadmissible under CRE 404(b) because it failed each prong of the *Spoto* test. He alleges the testimony is irrelevant because the neighbor could not identify the participants in the supposed fight, she did not understand what the participants were saying because

29

she did not understand much English, and the event happened many hours before the shooting. Furthermore, its admissibility served no other purpose besides showing propensity, and the danger of unfair prejudicial substantially outweighed its probative value.

¶ 60　　The People respond that "what the neighbor heard was admissible under simple relevancy principles." In other words, we understand them to be asserting that the neighbor's testimony was intrinsic under the *Rojas* framework because it directly proved the charged offense. We agree with that characterization. Evidence that Landrock and the victim were arguing, and perhaps came close to a physical altercation, close in time to the shooting tended to directly prove the charged offense. *See Jensen*, 55 P.3d at 140.

¶ 61　　In any event, nothing about the argument as described by the neighbor suggested bad character. Indeed, the words spoken were "not conduct, d[id] not amount to a crime, and d[id] not reveal prior bad acts." *People v. Greenlee*, 200 P.3d 363, 368 (Colo. 2009) (footnote omitted), *abrogated on other grounds by Rojas*, ¶35. Therefore, even if the neighbor's testimony could be considered extrinsic evidence, CRE 404(b) did not apply. *See Rojas*, ¶ 52 ("[I]f

extrinsic evidence does not suggest bad character, Rule 404(b) does not apply and admissibility is governed by Rules 401-403.").

## V.     Manslaughter — Aiding Suicide Charge

¶ 62     Landrock asserts that the district court reversibly erred by rejecting his tendered jury instruction on manslaughter — aiding suicide as a lesser-included offense of first-degree murder.[7]  This is because, he argues, manslaughter — aiding suicide involves the same elements as first degree murder but differs only in having a lesser degree of culpability and a less serious injury to the public interest.  We are not persuaded.

### A.     Standard of Review and Applicable Law

¶ 63     We review issues of statutory interpretation de novo.  *McCoy v. People*, 2019 CO 44, ¶ 37.

¶ 64     We review jury instructions as a whole to determine whether the jury was adequately informed of the applicable law.  *People v. Bondurant*, 2012 COA 50, ¶ 66.  If the jury is adequately instructed on the law, we will not disturb a district court's ruling concerning a jury instruction absent a showing of an abuse of discretion.  *Id.* at

---

[7] The court offered to instruct the jury on manslaughter — aiding suicide as a lesser *non*-included offense, but the defense declined.

¶ 67; *see also People v. Chavez*, 190 P.3d 760, 769 (Colo. App. 2007) ("It is within the sound discretion of the district court to determine whether additional jury instructions which properly state the law should be submitted."). A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or when it misapplies the law. *People v. Johnson*, 2021 CO 35, ¶ 16.

¶ 65 A person commits first degree murder if, "[a]fter deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person or of another person." § 18-3-102(1)(a), C.R.S. 2024. One way that a person can commit manslaughter is by "intentionally caus[ing] or aid[ing] another person to commit suicide." § 18-3-104(1)(b), C.R.S. 2024.

¶ 66 Section 18-1-408(1)(a), C.R.S. 2024, prohibits multiple convictions for more than one offense if "[o]ne offense is included in the other, as defined in subsection (5) of this section." An offense is a lesser included offense of another offense if the elements of the lesser offense are a subset of the elements of the greater offense, such that the lesser offense contains only elements that are also included in the elements of the greater offense. *Reyna-Abarca v. People*, 2017 CO 15, ¶ 64. If there is at least one way to commit the

32

greater offense in a manner that necessarily establishes all the elements of the lesser offense, the lesser offense is included in the greater offense. *Whiteaker v. People*, 2024 CO 25, ¶18. However, a lesser charged offense can differ from a greater charged offense "only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a lesser kind of culpability suffices to establish its commission." § 18-1-408(5)(c).

## B. Analysis

¶ 67 In denying Landrock's request to instruct the jury that manslaughter — aiding suicide was a lesser included offense of first degree murder, the court noted that the former required proof of an additional element — suicide — which is not an element first degree murder.

¶ 68 We agree with this conclusion. "Suicide" is not defined by the manslaughter statute, but, as a division of this court has already recognized, it requires "the killing of oneself," and there is "a distinction between killing oneself and being killed by another." *People v. Gordon,* 32 P.3d 575, 579 (Colo. App. 2001) (quoting *People v. Kevorkian,* 527 N.W.2d 714, 740 n.71 (Mich. 1994). Landrock even seems to concede this point when he argues that

first degree murder and manslaughter — aiding suicide have "no substantive distinctions . . . *other than the victim's participation.*" (Emphasis added.)

¶ 69 We are also unpersuaded that manslaughter — aiding suicide is included within first degree murder under section 18-1-408(5)(c). That provision applies if the former offense "involves a less serious injury or risk of injury 'to the same person, property, or public interest,' a lesser kind of culpability, or both." *Pellegrin v. People*, 2023 CO 37, ¶ 38 (quoting § 18-1-408(5)(c)). Regardless of the "public interest," the injury associated with both offenses — the victim's death — is the same. Thus, section 18-1-408(5)(c) does not apply.

¶ 70 Because manslaughter — aiding suicide requires a jury to find an additional, separate element (suicide) that is not an element of first degree murder, and because it does not involve a less serious injury "to the same person," § 18-1-408(5)(c), the court did not abuse its discretion by rejecting Landrock's proposed lesser included offense instruction.

## VI.  Cumulative Error

¶ 71    We have determined that the district court did not commit any errors, and thus Landrock's claim of cumulative error necessarily fails.

## VII.  Disposition

¶ 72    We affirm the district court's judgment.

JUDGE HARRIS and JUDGE PAWAR concur.